IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
HATTIESBURG DIVISION

**KAREN ANDERSON**                                                                                       **PLAINTIFF**

**V.**                                **CIVIL ACTION NO. 2:11cv223-KS-MTP**

**WAL-MART STORES EAST, L.P.**                                            **DEFENDANT**

## MEMORANDUM OPINION AND ORDER

This matter is before the Court on the Motion for Summary Judgment [38] of the Defendant Wal-Mart Stores East, L.P. ("Wal-Mart"). Having considered the parties' submissions, the record, and the applicable law, the Court finds that the motion should be denied.

## I. BACKGROUND

This is a premises liability action in which the Plaintiff Karen Anderson purportedly sustained injuries to her back and neck as a result of a slip and fall at the Wal-Mart store located at 5901 U.S. Highway 49, Hattiesburg, Mississippi. On October 6, 2011, Plaintiff initiated this against Wal-Mart by filing her Complaint in the Circuit Court of Forrest County, Mississippi. Plaintiff's Complaint alleges that on or about January 12, 2011, she slipped and fell in the garden center at the subject store because a Wal-Mart employee placed "a piece of metal" behind her while she was examining flowers. (Compl. [1-2] at ¶ VI.) On November 3, 2011, Wal-Mart removed the proceeding to this Court on the basis of diversity of citizenship jurisdiction under Title 28 U.S.C. § 1332. (*See* Notice of Removal [1].) On January 29, 2013, Wal-Mart filed its Motion for Summary Judgment [38], asserting that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. The motion has been fully

briefed and the Court is ready to rule.

## II.  DISCUSSION

### A.  Standard of Review

Federal Rule of Civil Procedure 56 provides that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Where the burden of production at trial ultimately rests on the nonmovant, the movant must merely demonstrate an absence of evidentiary support in the record for the nonmovant's case." *Cuadra v. Houston Indep. Sch. Dist.*, 626 F.3d 808, 812 (5th Cir. 2010) (citation and internal quotation marks omitted). The nonmovant must then "come forward with specific facts showing that there is a genuine issue for trial." *Id.* "'An issue is material if its resolution could affect the outcome of the action.'" *Sierra Club, Inc. v. Sandy Creek Energy Assocs., L.P.*, 627 F.3d 134, 138 (5th Cir. 2010) (quoting *Daniels v. City of Arlington, Tex.*, 246 F.3d 500, 502 (5th Cir. 2001)). "An issue is 'genuine' if the evidence is sufficient for a reasonable jury to return a verdict for the nonmoving party." *Cuadra*, 626 F.3d at 812.

The Court is not permitted to make credibility determinations or weigh the evidence. *Deville v. Marcantel*, 567 F.3d 156, 164 (5th Cir. 2009). When deciding whether a genuine fact issue exists, "the court must view the facts and the inferences to be drawn therefrom in the light most favorable to the nonmoving party." *Sierra Club, Inc.*, 627 F.3d at 138. However, "[c]onclusional allegations and denials, speculation, improbable inferences, unsubstantiated assertions, and legalistic argumentation do not adequately substitute for specific facts showing a genuine issue for trial." *Oliver v.*

*Scott*, 276 F.3d 736, 744 (5th Cir. 2002). Summary judgment is mandatory "'against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.'" *Brown v. Offshore Specialty Fabricators, Inc.*, 663 F.3d 759, 766 (5th Cir. 2011) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986)), *cert. denied*, 132 S. Ct. 2103 (2012).

**B.     Analysis**

The central issue is whether sufficient evidence exits for a jury to consider Plaintiff's negligence claim. Mississippi state law supplies the substantive authority for resolving this issue since jurisdiction is based on diversity. *See Wood v. RIH Acquisitions MS II, LLC*, 556 F.3d 274, 275 (5th Cir. 2009). Mississippi courts employ a three-step analysis in premises liability actions: "First, we must determine whether the injured party was an invitee, licensee, or a trespasser at the time of the injury. Next, we must determine what duty was owed to the injured party by the business owner/operator. Finally, we must determine whether that duty was breached." *Haggard v. Wal-Mart Stores, Inc.*, 75 So. 3d 1120, 1124 (¶ 9) (Miss. Ct. App. 2011) (citing *Rod v. Home Depot USA, Inc.*, 931 So. 2d 692, 694 (¶ 9) (Miss. Ct. App. 2006)).

Wal-Mart does not dispute Plaintiff's status as an invitee at the time of the subject incident. (*See* Def.'s Brief in Supp. of Mot. for SJ [39] at p. 12.) "Mississippi law imposes upon a business owner or operator a duty to the invitee to keep its premises in a reasonably safe condition and to warn of dangerous conditions which are not readily apparent to the invitee." *K-Mart Corp. v. Hardy*, 735 So. 2d 975, 981 (¶ 14) (Miss. 1999) (citations omitted.) However, a business owner is not an insurer against all

accidents and injuries that may occur on its premises. *Anderson v. B. H. Acquisition, Inc.*, 771 So. 2d 914, 918 (¶ 7) (Miss. 2000). Furthermore, mere proof of the existence of a fall within a business is insufficient to recover on a negligence claim. *Rod*, 931 So. 2d at 695 (¶ 12). In order to prove her premises liability cause of action, the plaintiff-invitee must show either:

> (1) a negligent act of the defendant caused her injury; (2) the defendant had actual knowledge of the dangerous condition, but failed to warn the plaintiff; or (3) the defendant should have known about the dangerous condition, in that the dangerous condition existed for a sufficient amount of time to impute constructive knowledge to the defendant.

*Id.* at 694-95 (¶ 10) (citing *Byrne v. Wal-Mart Stores, Inc.*, 877 So. 2d 462, 465 (¶ 5) (Miss. Ct. App. 2004)).

The record in this case fails to show that any employee, associate, agent, or representative of Wal-Mart actually knew of the existence of the dangerous condition alleged to have caused Plaintiff's fall, the "piece of metal"[1] on the floor of the garden center, prior to her fall. Also, no evidence has been presented to the Court tending to show that the metallic object was on the floor of the garden center for a sufficient length of time to impute constructive knowledge to Wal-Mart. *See Haggard*, 75 So. 3d at 1126 (¶ 15) ("The plaintiff must present specific proof as to the relevant actual length of time.") (citation omitted). Therefore, summary judgment is appropriate unless there are specific facts showing a genuine dispute for trial as to Wal-Mart's alleged creation of the dangerous condition at issue in this action.

"No proof of the owner's knowledge of the condition is necessary where the

---

[1] (Compl. [1-2] at ¶ VI.)

condition is created by his negligence or the negligence of someone under his authority." *Elston v. Circus Circus Miss., Inc.*, 908 So. 2d 771, 773 (¶ 9) (Miss. Ct. App. 2005) (citing *Drennan v. Kroger Co.*, 672 So. 2d 1168, 1171 (Miss. 1996)). Further, the defendant's negligence may be proven circumstantially. "Stated differently, 'the plaintiff may prove circumstances from which the jury might conclude reasonably that the condition of the floor was one which was traceable to the proprietor's own act or omission.'" *Id.* at 775 (¶ 16) (quoting *Miss. Winn-Dixie Supermarkets v. Hughes*, 247 Miss. 575, 585, 156 So. 2d 734, 736 (Miss. 1963)). Speculation or conjecture, however, is insufficient. The circumstantial evidence must create a legitimate inference. *See Hardy v. K Mart Corp.*, 669 So. 2d 34, 38 (Miss. 1996).

Plaintiff asserts that although she cannot state with certainty how the metal object causing her fall ended up on the floor, circumstantial evidence shows that it was likely part of shelving components that Wal-Mart employees were handling around the time of the incident. Plaintiff chiefly relies on the deposition testimony of Donna Anderson (her cousin) and Shane Bass (a Wal-Mart employee), as well as her own deposition testimony, in support of this contention. Wal-Mart, in support of summary judgment, relies heavily on video from a surveillance camera taken in the garden center on the date of the subject incident. Wal-Mart asserts that the video contradicts, in large part, Plaintiff's version of events. Wal-Mart also relies on affidavits from Shane Bass and two other Wal-Mart associates, Kathy Mitchell and Derek Jones,[2] who were working in the garden center on the date of Plaintiff's fall.

---

[2] Mr. Jones is no longer employed by Wal-Mart.

The following portions of Plaintiff's deposition testimony are particularly relevant to her negligence claim:

> Q. All right. So you enter the store, tell me what happens.
>
> A. We walk into the garden section, and she [Donna Anderson] says, "I'm going to drop the prescription off." And I said, "Well, I'm going to stand back here and look for some yellow roses." And I walked around behind the cash register, and they were moving -- they had all these boxes and stuff out in the middle of the aisle, and I walked around because a lot of the aisles were empty. And they had -- was moving stuff off the aisle where they had the roses at, the end of the aisle on the right. And I walked in there and I was standing there and they was steady bringing stuff off that aisle, and I was just looking at the colors they had. And then when I turned around, that's when I went down.
>
> . . . .
>
> Q. Did you see anything on the floor -- well, let me just start -- did you ever come to an understanding of what made you trip or slip?
>
> A. I did not see anything in the floor when I -- because I was looking all the way down. But they were bringing things, you know, the crates back behind me and pushing them out in the -- those Christmas stuff out into the section there where they had everything just piled up. And when I turned around, there was a piece of metal, flat metal, and I didn't see the metal when I was laying -- when I come to. There was this tall guy had walked around behind the managers and the other girl that was helping to get me up, he picked it up off the floor and set it on top of the box right there by the roses.
>
> . . . .
>
> Q. Okay. And as you went to look at the roses, did you notice anything on the floor? Did you notice that piece of metal on the floor?
>
> A. No.
>
> Q. Okay. Was your attention directed or were you looking in such a way that if that piece of metal had been on the floor, you would have seen it?
>
> A. Oh, I would have seen it.
>
> Q. Okay. And when you say flat, is it flat like this notepad?

A. It was flat. It's like a -- if you're a mason or something you would know what -- it's just like -- it looks like this.

Q. Okay. It's L-shaped?

A. It's L-shape.

Q. Okay. But the piece of metal, it was flat?

A. It was flat.

Q. What color was it?

A. Silver.

Q. Okay. So when you walked -- let me just say, so when you got to where the cash register is and then you turned to walk and go look at the roses --

A. Uh-huh.

Q. We can be sure that when you went to get the roses at that point, that piece of metal, whatever it was, wasn't on the floor?

A. No.

Q. Okay. So you walked, looked at the roses, we know that there was nothing on the floor yet?

A. Yeah.

Q. Okay. We're sure of that. You turned around, and how soon after you turned around to go find Donna did you slip?

A. I mean, soon as I turned around, my foot hit it and I went spinning. I mean just -- it just bam. I was on the floor.

. . . .

Q. All right. So you walk to where the roses are, that L-shaped piece of metal is not on the floor, we're sure of that?

A. Yeah.

Q. And then when you turn around, whatever that was, that's what you stepped on; and it slipped out from under you, and that's how you came to

fall?

A. Yes.

. . . .

Q. The piece of metal, do you know where it came from?

A. No.

Q. All right. And we know it had only been on the floor for however long it took you to walk past that spot, look at roses, and turn around?

A. Uh-huh. Yes.

Q. How long did it take you to surmise that they didn't have any yellow roses?

A. I was there probably about -- I'd say about five minutes.

Q. Okay?

A. Because I was looking, you know, at all the colors because they hadn't bloomed yet.

Q. Okay. So you turned on the aisle, you looked at roses for about five minutes?

A. Yes.

Q. And then you turned around, and when you turned around, boom.

A. Bam.

Q. All right. And the piece of metal, you don't know where it came from?

A. No.

Q. Do you know when it got on the floor?

A. Not unless it was when they were pulling that dolly or long thing with all that Christmas stuff through there. Because, you know, he said excuse me, and I scooted up a little bit and then he went on and pulled the box on out -- I mean the Christmas stuff.

Q. Was this going on behind you as you looked at roses?

A. Uh-huh. Yes.

Q. Okay. This didn't happen before you started down the aisle to look at roses?

A. No.

Q. So you don't know what it was. We don't know when it got on the floor. That's right?

A. That's right.

Q. Did it look like a piece of something? Do you know what it belonged to or what it went to?

A. To me it could have been a shelf bracket that they -- thing or -- thing when you measure out when you're cutting a --

Q. Like for a right angle kind of thing?

A. Yeah.

Q. Okay. So it could have been -- I don't know what carpenters call it, but it could have been one of those?

A. Yes.

Q. Or you think it could have been like a piece of a shelving unit?

A. Yeah, a shelving unit.

Q. Did anybody ever say anything in words or substance about what that piece of metal was?

A. No.

Q. Did anybody every say anything in words or substance about how it got on the floor?

A. No.

Q. Did anybody say anything in words or substance about how long it had been on the floor?

> A. No.
>
> . . . .
>
> Q. The piece of metal, when you came to -- I take it at some point after you fell, after you kind of regained consciousness and got yourself corrected, you were able to look on the floor and see the piece of metal?
>
> A. I saw the guy pick it up off the floor.

(Pl.'s Dep. [39-2] 85:15-86:6, 86:14-87:4, 87:21-89:8, 90:11-19, 91:12-93:24, 94:5-10.) Plaintiff also stated that while she was looking at roses and before she turned around and fell, two men pulled a pallet behind her.

Wal-Mart posits that video taken in the garden center on the date of the subject incident "shows (a) Plaintiff stood in front of the rose display for five (5) seconds, not five (5) minutes, (b) no Wal-Mart Associates walked behind her as she stood there, and (c) no pallet passed behind her." (Def.'s Brief in Supp. of Mot. for SJ [39] at p. 6.) The video was produced during discovery and no objection to its accuracy or use for summary judgment purposes has been lodged by the Plaintiff. The United States Supreme Court has held that "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380, 127 S. Ct. 1769, 167 L. Ed. 2d 686 (2007). In *Scott*, the Court found that the disputed facts should have been viewed in the light depicted by a videotape that utterly discredited a plaintiff's version of events. *Id.* at 380-81. Therefore, this Court may rely on the Wal-Mart video evidence in ruling on summary judgment to the extent the video clearly contradicts Plaintiff's positions.

Upon review of the subject Wal-Mart video, the Court is of the opinion that it

negates Plaintiff's testimony that she looked at roses for 5 minutes and that a pallet passed behind her. Also, it does not appear that any Wal-Mart employee or associate walked behind the Plaintiff while she looked at roses. It appears that the Plaintiff was in the garden center for only approximately twenty (20) seconds before she fell, and that she only spent approximately six (6) of those seconds looking at roses. The video shows a pallet with boxes located near the end of one of the garden center aisles prior to Plaintiff's appearance on camera. The video further shows two Wal-Mart associates speaking to each other near the vicinity of the pallet. Neither associate can be seen passing behind the Plaintiff while she examined roses. Also, no one moved the aforementioned pallet toward the Plaintiff.

However, the video evidence does not necessitate a grant of Wal-Mart's summary judgment motion. The specific area of Plaintiff's slip and fall is obstructed by a cash register unit. The Plaintiff is essentially off camera at the time of her fall and the floor where she fell is never displayed. Therefore, Plaintiff's testimony that she slipped and fell on a metal object is not "blatantly contradicted" or "utterly discredited by the [video] record . . . ." *Scott*, 550 U.S. at 380. The camera angle and aforementioned cash register also preclude any definitive rejection of Plaintiff's testimony that an individual picked up the subject piece of metal and placed it on a box after her fall. Although Plaintiff's speculation that the metallic object was placed on the floor when two Wal-Mart associates passed behind her with a pallet is contradicted by the video evidence, she also testified that she neither knew "where it [the metal object] came from" nor "when it got on the floor." (Pl.'s Dep. [39-2] at p. 92.) Consequently, the jury might conclude the piece of metal was on the floor before the Plaintiff entered the

-11-

garden center and that the Plaintiff failed to notice it until she slipped and fell. In Mississippi, a plaintiff's failure to recognize an open and obvious danger operates to reduce damages, not to preclude liability. *See Tharp v. Bunge Corp.*, 641 So. 2d 20, 25 (Miss. 1994).

The affidavits of Shane Bass, Kathy Mitchell, and Derek Jones also do not mandate summary judgment in Wal-Mart's favor. Shane Bass is currently, and was at the time of the subject incident, employed by Wal-Mart as a Zone Merchandise Supervisor. Kathy Mitchell is currently, and was at the time of the incident, employed by Wal-Mart as the Garden Center Department Manger. Derek Jones was a Sales Associate for Wal-Mart in January of 2011. Each of these individuals was working in the garden center on the date of Plaintiff's fall.

Mr. Jones, Mr. Bass, and Ms. Mitchell all deny seeing the existence of any object on the floor of the garden center that could have caused Plaintiff's fall. These sworn statements weigh against Plaintiff's deposition testimony that she slipped on a piece of metal on the garden center floor. However, the evidence is not to be weighed at this stage of the litigation and "a genuine issue of material fact is obviously present where one party testifies to one account of the matter in interest and the other party swears otherwise." *Ill. Cent. R.R. Co. v. Harried*, 681 F. Supp. 2d 772, 775 (S.D. Miss. 2009) (citing *Allen v. Mac Tools, Inc.*, 671 So. 2d 636, 643 (Miss. 1996)). Moreover, Ms. Mitchell testified at deposition that after the Plaintiff fell, she observed a "snap bar" lying on the floor of the garden center aisle closest to the location of Plaintiff's fall. (Mitchell Dep. [39-5] 87:22-88:6.) Snap bars, sometimes referred to as snap rails, are square-shaped metallic bars approximately one-inch in width, ranging from thirty to forty-eight

inches in length, used to set merchandise on store shelves. (*See* Mitchell Dep. [39-5] 73:5-75:24; Bass Dep. [39-4] 26:6-29:7.) Ms. Mitchell did not think that the snap bar she observed caused Plaintiff's fall, apparently because she saw it lying near the middle of the aisle and the Plaintiff seemed to fall at the end of aisle. However, Ms. Mitchell's observation of a metallic object, which would have been used by Wal-Mart employees in their work, on the floor of the garden center close in time to, and in the general vicinity of Plaintiff's fall hardly negates Plaintiff's circumstantial evidence-based avenue of recovery.

The affidavits of Shane Bass and Kathy Mitchell also describe what type of work they and other Wal-Mart associates were performing in the garden center on the date of Plaintiff's fall, and the equipment used in that work. On that date, Wal-Mart associates "were setting up the spring seasonal displays where the Christmas merchandise had been, i.e., setting modulars on the counters." (Mitchell Aff. [39-7] at ¶ 3.) This involved using various pieces of hardware or "fixtures". (Bass Aff. [39-6] at ¶ 3; Mitchell Aff. [39-7] at ¶ 3). The only fixtures Mr. Bass and Ms. Mitchell could recall using were snap rails, hooks, and shelves. "Snap rails" are described in the preceding paragraph. The "shelves" utilized "that day are one-piece metal shelves of varying sizes." (Mitchell Aff. [39-7] at ¶ 6.) The "hooks" appear to be metal rods that are placed on the snap rails and from which merchandise can be hung. (Bass Aff. [39-6] at ¶ 5.) Pictures of these various types of fixtures are attached to Mr. Bass and Ms. Mitchell's affidavits. (*See* Doc. Nos. [39-6], [39-7].) Both Ms. Mitchell and Mr. Bass state that they have read pages 86 through 88 of Plaintiff's deposition, and conclude that none of the fixtures or tools they were using fit the description of "a silver, flat, L-shaped piece of metal." (Bass

Aff. [39-6] at ¶ 10; Mitchell Aff. [39-7] at ¶ 10.)

The Court fails to find that Mr. Bass and Ms. Mitchell's statements regarding "fixtures" negate as a matter of law the likelihood of Plaintiff slipping and falling on a metal component used by Wal-Mart associates to set out merchandise and displays. First, such a ruling requires the Court to overlook or give no credence to the portion of Plaintiff's deposition testimony describing the metal object she slipped on as a "shelf bracket" or "shelving unit." (Pl.'s Dep. [39-2] 93:3-14.) There is also some conflict between the Bass-Mitchell statements and the following deposition testimony of Plaintiff's cousin, Donna Anderson:

> Q. Okay. Did you ever see a piece of metal on the floor at any point after Karen fell?
>
> A. I seen something, but I couldn't make it out what it was, but I wasn't paying attention.
>
> Q. Okay. Where was it?
>
> A. It was like at the end of the aisle by a box.
>
> Q. All right. Do you remember what it looked like?
>
> A. To me it looked like an L-shaped shelf thing.
>
> Q. Like a shelf bracket?
>
> A. Yes, sir.
>
> Q. All right. What color was it, if you recall?
>
> A. It was silver, I think.

(D. Anderson Dep. [39-3] 17:11-18:1.) Mr. Bass and Ms. Mitchell's affidavits do not indicate that they read Donna Anderson's deposition or page 93 of the Plaintiff's

deposition. Moreover, in reviewing the pictures of the various "fixtures" attached to the Bass-Mitchell affidavits, the Court finds it within the realm of reasonable probability that a person unfamiliar with the fixtures might refer to one of them, or a section of one of them, as a "shelf bracket", "L-shaped", "flat", or "silver".  Ultimately, a jury, with its ability to listen to live testimony, weigh evidence, and make credibility determinations, would be in a better position than the Court to determine the likelihood of the Plaintiff slipping and falling on a metal shelving fixture or component utilized by Wal-Mart employees. *See EEOC v. Chevron Phillips Chem. Co.*, 570 F.3d 606, 612 n.3 (5th Cir. 2009) ("a district court cannot make credibility determinations or weigh the evidence when deciding a summary judgment motion") (citation omitted).

In summation, there are sufficient circumstances in dispute in this case to preclude a grant of summary judgment in Wal-Mart's favor.  The Plaintiff has testified that on January 12, 2011, she slipped and fell on a piece of metal in the garden center of the Defendant's store.  The Plaintiff's cousin, who was in the garden center at the time of Plaintiff's fall, has testified that she saw a piece of metal on the floor after the Plaintiff's fall.  It is undisputed that at least two Wal-Mart employees were setting out merchandise and displays, while utilizing various metal components, in the garden center on January 12, prior to the Plaintiff's fall.  One of those employees, Kathy Mitchell, has testified that she observed a metallic bar, which would have been used to set out merchandise on store shelves, on the floor shortly after the Plaintiff fell.  Another employee, Shane Bass, "worked in the area of the store where this [incident] occurred in the garden center that morning before th[e] accident".  (Bass Dep. [39-4] 10:8-11.) These circumstances, taken as a whole and viewed in the nonmoving party's favor,

might permit the jury to "conclude reasonably that the condition of the floor was one which was traceable to the proprietor's own act or omission . . . ." *Hughes*, 156 So. 2d at 736, 737 (holding that the trial court properly submitted to the jury the issue of whether the existence of vermicelli on the floor of a supermarket was traceable to the defendant because the jury could reasonably infer that the vermicelli package was damaged by an employee during the stocking process).[3]

Wal-Mart's principal authority on the issue of its purported creation of the condition alleged to have caused injury in this case, *Haggard*, 75 So. 3d 1120, is inapposite. There, the plaintiff slipped and fell on an unknown liquid substance and there was nothing in the record to indicate that a Wal-Mart employee caused the spill. *See id.* at 1125 (¶ 12). Here, there is sufficient circumstantial evidence in the record to create a jury issue on Plaintiff's negligence claim.

### III. CONCLUSION

It is far from certain that Wal-Mart is responsible for the existence of a metal object on the floor of its garden center resulting in Plaintiff's slip and fall. Furthermore,

---

[3] *See also Hudson v. Wal-Mart Stores, East, L.P.*, No. 2:07cv62, 2008 WL 1449887, at *4 (S.D. Miss. Apr. 9, 2008) ("The fact that Wal-Mart employees are collectively responsible for stocking store shelves, that at least three employees were assigned to the pet food isles on the day in question, and that no evidence or testimony has implicated any customer, including Hudson, for stocking store shelves, leaves the only alternative supported by the evidence that Wal-Mart employees were responsible for the dangerous condition."); *K-Mart Corp.*, 735 So. 2d at 981-82 (¶¶ 17-20) (affirming the trial court's denial of K-Mart's motion for JNOV because the issue of causation was subject to varying determinations and the jury could reasonably infer that an employee's faulty configuration of an end-cap display resulted in the plaintiff slipping and falling on a spilled can of paint); *Munford, Inc. v. Fleming*, 597 So. 2d 1282, 1285 (Miss. 1992) (holding that sufficient evidence was presented to create a jury issue as to whether the defendant's negligence created a puddle of water on its premises when it was possible that a store customer *or* an employee's handling of a water bottle caused it to leak).

the Court has serious doubts about whether the Plaintiff will ultimately prevail on her negligence claim at trial. However, the Court's task at this stage of the proceedings is not to make credibility determinations, weigh the evidence, or resolve doubts in Wal-Mart's favor. The "court must view the facts and the inferences to be drawn therefrom in the light most favorable to the nonmoving party." *Sierra Club, Inc.*, 627 F.3d at 138. Accordingly, summary judgment in favor of Wal-Mart will be denied.

IT IS THEREFORE ORDERED AND ADJUDGED that Wal-Mart's Motion for Summary Judgment [38] is denied.

SO ORDERED AND ADJUDGED this the 3rd day of April, 2013.

>   *s/Keith Starrett*
>   UNITED STATES DISTRICT JUDGE